**Earven GIBSON, Appellant,**

**v.**

**James W. SMITH and Annie Mae Smith, Respondents.**

**No. 52667.**

Supreme Court of Missouri, Division No. 2.

Jan. 8, 1968.

Thomas M. Gioia, St. Louis, for appellant.

Thompson, Walther & Shewmaker, Lewis M. Blanton, St. Louis, for respondents.

ELGIN T. FULLER, Special Judge.

Earven Gibson, appellant and plaintiff below, brings this action in equity to set aside a general warranty deed executed by Walter Leon Smith (now deceased) to respondents, James W. Smith and Annie Mae Smith, his wife. The trial court found for the defendants. This suit to have the deed set aside involves title to realty in a

constitutional sense so as to confer exclusive jurisdiction on this court.[1]

■ This action in equity is to be reviewed de novo on the record and we must weigh the evidence, make our own findings of fact, draw our own conclusions of law and enter or direct the entry of the judgment so indicated. In this character of appeal we are triers of the facts as well as of the law.[2]

The facts need more attention than the law. No new pronouncements of the law are required, for the law controlling the fact issues of this case have been declared by this court on many occasions. The witnesses were not restrained or limited by any consideration of our Dead Man's Statute or in any way handicapped by the rules pertaining to hearsay evidence. All witnesses were given a free rein.

The plaintiff is a half-brother of the grantor, Walter Smith. He was also the residuary legatee and devisee of Walter Smith's will, which was executed August 2, 1963. Walter died December 24, 1963. But on the 28th day of June, 1963, Walter conveyed by warranty deed the only real estate he owned to defendants James W. Smith and Annie Mae Smith. The real estate was the west 30 feet of Lot 3 and the east 10 feet of Lot 4 in Block 3831 of the City of St. Louis, upon which was located his dwelling known and numbered as 5928 Plymouth Avenue. The warranty deed was recorded August 8, 1963.

Plaintiff's petition alleged that on or about June 28, 1963, defendants, for the purpose of defrauding Walter Leon Smith out of his "just rights", did persuade, unduly influence and induce him to convey the real property for a consideration of $10.00; that the transaction and conveyance were a scheme to obtain title without consideration and to defraud *plaintiff*; that

said deed was without consideration and therefore void; that shortly before his death Walter Smith believed himself to be the owner of said real estate and expressed his desire and intention that plaintiff should, at Walter's death, inherit the real estate from him. Plaintiff asked that the warranty deed conveying the property to defendants be set aside and that the court declare title in the plaintiff.

These charges call for a rather careful review of the evidence. Walter Smith and his elderly mother lived in the dwelling at 5928 Plymouth Avenue, St. Louis, Missouri. He had purchased the home in 1955 for $11,750.00. In 1932 defendant, James W. Smith, came from his home in Clarksdale, Mississippi, to live with his cousin, Walter Smith. After living with Walter in St. Louis for four years he then moved to Chicago, Illinois, where he is now self-employed in the cleaning business. James returned on frequent visits to St. Louis and stayed at the home of Walter. James' mother, Edna Smith, also resided in Chicago and has been in Walter's home many times through the years. She and Essie Frazier, a relative of James, spent weekends at Walter's home.

Walter's troubles really began at the time he suffered a paralytic stroke about August 1960. James' mother, Edna Smith, and Essie Frazier, a cousin of Edna Smith, came to Walter's home and, when not taking care of Walter's mother, visited Walter in the hospital. On that occasion they remained at Walter's home about a month. James came a little later and at that time Walter was walking with the aid of a cane, but had hopes of returning to work, and in fact did return to his employment with Shell Oil Company. After a few days James returned to Chicago.

In 1962, probably in July, Walter's mother had a paralytic stroke and two days

1. Art. V, § 3, Constitution of Missouri, V.A.M.S.

2. Cleary v. Cleary, Mo., 273 S.W.2d 340, 346; Watkins v. Watkins, Mo., 397 S.W. 2d 603; Vineyard v. Vineyard, Mo., 409 S.W.2d 712; Herrold v. Hart, Mo., 290 S.W.2d 49.

later Walter had his second stroke. Willie B. Smith, a first cousin of Walter who was a resident of St. Louis, and a brother of Edna Smith, had Walter and his mother taken to a hospital. Willie did the best he could, during their illness, to keep Walter's utilities and small bills paid. Edna Smith, Essie Frazier and James came from Chicago to be with Walter and Walter's mother. They visited the two at the hospital. Walter was worried about the monthly home payments due on the note which was secured by a deed of trust. Walter asked James about James' financial condition in the event Walter would need help or ran into any financial trouble and if James would make sure that Walter would not lose his house. Walter wanted to be sure that he did not miss any payment on his note. James told Walter that he was sure he would be able to make the home payments and that he would not fail to make the monthly payments and that he, James, would pay the note if it became necessary. At this time Walter said nothing about deeding the property to James. James then returned to Chicago. His mother and Essie Frazier remained to care for Walter and his mother. Edna, Essie Frazier and defendant, Annie Mae Smith, took care of Walter and his mother much of the time until Walter's death. When his mother and his cousin, Essie, were taking care of Walter, James sent money to them to help pay bills and expenses of the home. On one occasion James sent one hundred dollars to Willie Smith to pay either a delinquent income tax of Walter's or the monthly payment on the home. When Walter's mother again became ill, James came to St. Louis. At that time Walter was receiving $105.00 Social Security and felt that that would pay the ordinary living expenses, but he was worried again about the $115.00 monthly payment due on the purchase price of his home. Walter told James, "I don't know if I will be able to go back to work again, and if you have to pay hundreds of dollars for me, I don't know if I will ever be able to pay you. In case that would happen I would just

have to deed the house over to you * * * the house would be yours to compensate you * * *." James said, "That is okay." James then went back to his home in Chicago.

Defendant Annie Mae Smith came to Walter's home in December, 1962 and took care of Walter for about three weeks. Edna was there from March to July, 1963. Essie and Edna were there looking after Walter and his mother from Easter Sunday until sometime in July, 1963. James continued to send money to help pay the expenses. James testified that he paid between $1,000 and $1,500 on behalf of Walter; that he had agreed to pay any bills that Walter could not pay out of Walter's and his mother's monthly checks, but that the main thing was payment on the "house note". On one occasion he paid Millie Johnson $60.00 for three weeks' work in looking after Walter. Walter had employed her at twenty dollars a week, but had failed to pay her for a three-week period.

Several weeks before Walter conveyed the property to James and his wife, James' mother, who was then looking after Walter, telephoned James at Chicago and told him that Walter wanted to see James and to talk to him about "deeding the house to James". James had a vacation due him in a few weeks and wanted to wait until that time to come to St. Louis. After one or two other similar calls from his mother, James talked to a lawyer in Chicago and asked if he knew a lawyer in St. Louis who could take care of that kind of business. Attorney Robert E. Wilson, Jr., of St. Louis, was chosen. Mr. Wilson went to Walter's home and told him the purpose of his call. Walter told Wilson that he had a nephew in Chicago whom he had practically raised and had brought the young man from Mississippi to St. Louis, and that he wanted him to have his property; that he wanted to prepare for the balance of his life and to see that his, Walter's, mother was taken care of. Attorney Wilson then prepared a Warranty Deed. On one of his trips to Walter's home he had seen Araminta Smith,

the Assistant Director of the Social Service Department at Malcolm Bliss Hospital. She had a Masters Degree from Washington University in social work. She is not related to any of the parties or witnesses in this case. Her duties necessitated her being in Walter Smith's home from twice a week to sometimes every day of the week. Walter had told Miss Araminta Smith of his plan to deed the property to James. Araminta testified, "At that time he told me definitely that he knew this was a good plan, and that James Smith would really take care of him because he was a good man and that he owned a cleaning establishment in Chicago and he had a fine family, and he was impressing me that this was a good plan". Walter told Araminta the date that the attorney was going to return to Walter's house. The attorney also asked Araminta if she would meet him at Walter's home. Wilson read the deed to Walter and asked him if that was the way he wanted it. Walter said that it was, and signed the deed. Mr. Wilson had also prepared a second writing entitled "Contract for Support in Consideration of Conveyance with Reverter Provisions". Wilson read and explained this document to Walter. Mr. Wilson, Araminta Smith and Mary Witherspoon, a neighbor and who was sometimes referred to at the trial as the "stocky lady who lived on a side street", attest to an unusual occurrence immediately following the signing of the deed by Walter. Mrs. Witherspoon herself relates the incident about as well as the others who were present:

"Well, the morning they came in with the papers they asked me would I be excused, that they—they said they got a little business to transact and they said, 'Would you go out?' I said, 'No, I am not going out'. I looked around at this lady that was there and I said, 'Is that clear?' I didn't say nothing else, and I went over by the bed where Walter was—I was over there in back of the bed, and I come around to the front of the bed, and I stood there when he held out to Walter another paper

* * * and I jumped up, and I said, 'Don't you sign another paper!' * * * He had signed the first one, but I said, 'If you sign another one I am going to take it and tear it up.' * * * Miss Smith said, 'You don't have anything to say about it'. I said, 'I got a lot to do with it; you are trying to get these folks' home, so they don't have any home' ".

Araminta puts it a little more mildly:

"As I recall, while we were in the room, a lady came prancing into the house, and she started screaming and hollering. As I recall, she said, 'Don't sign it! Don't sign it!' And then she started to make derogatory remarks about the attorney, and said that he was trying to take Walter Smith's property away from him".

Walter did not sign the "Contract" which the attorney had prepared and Walter stated that he did not want to sign that paper until James Smith had signed it. Defendants, James and his wife, Annie Mae, were in Chicago at the time Walter signed the deed, which was acknowledged by Attorney Wilson, who was also a Notary Public. James had never seen the "Contract" and knew nothing about it. Wilson had never talked with James about the separate contract which Wilson had prepared, and in fact James had never met Attorney Wilson. Wilson testified that the idea of the separate contract was his own.

Since the basis of the charge of fraud largely centers around the execution and recording of the Warranty Deed without Walter Smith having first signed this Agreement, more should be said about the Contract. In it Walter Smith was designated First Party and James W. and Annie Mae Smith, his wife, were designated Second Parties. First, it contained a preamble clause reading, "Whereas, first party has, *upon the execution of this instrument,* executed and delivered to second parties a deed conveying to them the following de-

scribed real estate:" (the property here involved). Generally the contract provided that defendants would provide a home for First Party and his mother, furnish necessary food, clothing, lodging, laundry, medical and nursing care and expenses of their last illness, funeral and burial. It further provided that Second Parties were entitled to possession of said real estate on the date of execution of the Agreement and Warranty Deed. Second Parties were to pay all taxes on and assessments against the real estate and keep it insured and repaired. It contained a provision against selling or mortgaging during Walter's lifetime, without his written consent. In case of default on the part of Second Parties the real estate would revert to First Party. First Party agreed that he and his mother would turn over to Second Parties all monies received by them from Social Security and Old Age Assistance, which were to be used solely for the support and maintenance of First Party and his mother.

Back to the scene in Walter's home—after he told the attorney that he did not want to sign the Agreement until James had signed it. Wilson then told Walter that Wilson was going to Chicago over the 4th of July and would take the Contract to James and bring it back to Walter upon his return. Wilson saw James in Chicago and showed him the deed and the contract. He explained the purpose of the contract. James testified that the written "Contract for Support in Consideration of Conveyance with Reverter" was not the agreement that he and Walter had made, but that it seemed to him that "it was for the protection of Walter and Aunt Jane", and having no objections, he and his wife signed it.

Upon his return to St. Louis about the second week in July Attorney Wilson took the contract to Walter. Walter told Wilson that he was not going to sign the agreement at that time, and that he would let Wilson know when he was ready to sign it. Sometime during the latter part of July Walter told Wilson that he was not going to sign

the agreement but that Wilson should go ahead and have the deed recorded.

About this time James came from Chicago to see Walter. He wanted to talk to Walter about his signing the agreement. He called Attorney Wilson and they met at Walter's home. Araminta Smith, the social worker, was also there. Both Wilson and the social worker explained to Walter that the "Contract for Support in Consideration of Conveyance with Reverter" was for his benefit. But Walter did not sign the contract. It was even suggested by the attorney that if Walter did not want to sign the agreement perhaps Walter should have the attorney prepare a deed for execution by defendants, James W. and Annie Mae Smith, conveying the property back to Walter. Walter, however, did not request that to be done. James testified that Walter said that somebody had told him at that time (presumably at the time he executed the Warranty Deed) not to sign any more papers—that they said somebody was trying to take the house from him, and not to sign any more papers at all.

Sometime in July, 1963, a misunderstanding arose, usually referred to in the evidence as a "confusion", over exactly who was in charge of Walter's household. This confusion was never explained and could have occurred between Walter and Edna Smith or between Edna and either Mary Alice Cobb or Mrs. Cobb's mother, Mary Witherspoon. Edna Smith then left to return to her home in Chicago. The next morning Mrs. Cobb asked Walter if he had other relatives and on being told that Walter had a half-brother in Lexington, Mississippi, Mrs. Cobb contacted the half-brother, Earven Gibson, the plaintiff. Walter had told the social worker that he hadn't seen Gibson for ten years. Gibson enters the scene July 18, 1963. He took charge at once. Willie Smith, who had had the responsibility of paying the monthly payments on Walter's home, soon learned that he no longer was to attend to that. Mrs. Cobb was designated as the one to collect

the rent from an apartment on the first floor of Walter's house and to send it to plaintiff Gibson upon his return to Mississippi, and, in fact, was placed in charge of Walter's household. Millie Johnson, who worked in Walter's home and who was paid by Walter "sometimes when he had it" and by James Smith at other times, was paid by Gibson from Walter's income after Gibson's arrival. Fifteen days after plaintiff came to St. Louis, Walter's Last Will and Testament was executed which, after providing for payment of his just debts and funeral expenses, devised and bequeathed all of his estate, real, personal and mixed, to plaintiff, Earven Gibson. Soon after the execution of the will plaintiff returned to his home. Plaintiff returned to Walter's home once a month until Walter's death December 24, 1963.

About one month after the execution of the deed, Walter told the social worker that he had changed his mind, that he wasn't going to go through with the original plan with James Smith, and that upon the suggestion of a neighbor he was going to contact his half-brother in Mississippi. The social worker was "surprised and shocked". Walter told her that the relatives, James Smith and Edna Smith "might not do the right thing by him, that they would probably— he said that he knew that they would take his money and not give anything in return, and that if he went ahead with it why, they probably wouldn't follow through with it".

When plaintiff Gibson came to St. Louis, Araminta Smith told him that she would like to talk to him about future care for Walter. Gibson said that he would be outside Walter's house walking around. When the social worker went outside she was unable to find Gibson. When she got back

to her office she made an appointment to meet him and to discuss the care Walter needed, but Mr. Gibson did not appear for that appointment.

After Walter's death James W. Smith sent the monthly payment on the house to William J. Kempf, the holder of the note and deed of trust, but Mr. Kempf refused the payment "because I had received payment from Mr. Gibson". Mr. Gibson had made the house-payments since he took charge in July, 1963. The Last Will and Testament of Walter Leon Smith was admitted to probate March 6, 1964.

Under these circumstances and facts plaintiff charges defendants James W. Smith and his wife with fraud. Specifically he claims: (1) There was no definite oral agreement to convey; (2) The oral contract itself was unfair and unconscionable; (3) Failure of performance of the oral contract; (4) The oral contract was not based on adequate consideration; (5) Undue influence and (6) The failure of the defendants' attorney to return the deed to the deceased after the deceased refused to sign the contract, was a fraud.

■ In considering the issues here presented we should bear in mind that the cancellation of a deed calls for the exercise of the most extraordinary power of a court of equity, which ought not be exercised except in clear cases upon proof which is clear, cogent and convincing.[3]

■ When fraud is alleged "the burden of proof rests upon him who asserts it to make it manifest".[4] If a deed is sought to be cancelled on the ground of fraud, the evidence must go beyond a mere preponderance of the testimony and remove all rea-

3. Lastofka et al. v. Lastofka, 339 Mo. 770, 99 S.W.2d 46, 54; Cruwell v. Vaughn, Mo., 353 S.W.2d 616, 624 [1–4]; Edinger v. Kratzer, Mo., 175 S.W.2d 807, 813; Dillard v. Dillard, Mo., 266 S.W.2d 561, 563 [2–4]; Herrold v. Hart, Mo., 290 S.W.2d 49, 55 [2, 11]; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 68; Allan v. Allan, Mo., 364 S.W.2d 578, 582 [8, 9]; Schneider v. Johnson, 357 Mo. 245, 207 S.W.2d 461, 466 [2, 3]; Wilkie v. Elmore, Mo., 395 S.W.2d 168, 172; Radford v. Radford, Mo., 388 S.W. 2d 33, 38; and Reinheimer v. Rhedans, Mo., 327 S.W.2d 823.

4. Lowther v. Hays, Mo., 225 S.W.2d 708, 713.

sonable doubt. Weissenfels v. Cable, 208 Mo. 515, 106 S.W. 1028; Sebree v. Rosen, Mo., 349 S.W.2d 865. Or, to express it another way, the proof to justify such action on the part of the court must be so clear, convincing and complete as to exclude all reasonable doubt in the mind of the chancellor.[5] Fraud imputes venality and corruption to the person charged with it, and both reason and law require clear and convincing proof of it. The difficulty of proving fraud does not dispense with the necessity of making the required proof. Nor is fraud ever presumed. Hardwicke v. Hamilton, 121 Mo. 465, 26 S.W. 342; Schnuck v. Kriegshauser, Mo., 371 S.W.2d 242.

The oral agreement between Walter and James entered into many months prior to the execution of the deed by which James Smith promised to pay the bills Walter could not pay—and particularly the promise that James would, if Walter could not pay them, assume the monthly payments on the deed of trust encumbering Walter's home, and the promise by Walter that "I would just have to deed the house over to you * * * the house would be yours to compensate you", was the agreement which led to the signing of the deed by Walter. Here was a man who had suffered a second paralytic stroke and he was disturbed about his mother's and his own welfare. He did not want to lose his home. And it was a natural thing for him to look to James Smith. The idea of conveying the property to James and his wife was Walter's. There is no evidence of fraud or undue influence on the part of the grantees. The evidence reveals nothing unfair or unconscionable about the oral agreement.

When it became apparent that Walter and his mother needed help after both had suffered strokes, it was James W. Smith, his mother, Essie Frazier, and his wife who came from Chicago to care for Walter and his mother. James sent money to help pay the expenses of managing the household. He paid $60.00 to Millie Johnson for work she had performed in the home. He sent $100.00 to pay either the taxes or a monthly payment on the home. He testified that he paid between $1,000 and $1,500 on behalf of Walter. About the time of Walter's death he sent the monthly payment on the home which was soon to be due. All of such acts constitute performance of the contract by James W. Smith.

The assurance given to Walter by James that James would pay such of Walter's household expenses or bills that Walter could not pay, and his promise to assume the payments on the home, if that became necessary, coupled with the subsequent performance by James, were adequate consideration for the conveyance. His performance was unequivocally and solely referable to the oral agreement. Two quotations from Radford v. Radford, Mo., 388 S.W.2d 33, 39, are illustrative: " ' * * * Failure of consideration, like lack of consideration, is not generally considered a sufficient ground for equitable cancellation of an instrument in the absence of some additional circumstance independently justifying this relief, such as fraud, duress, or mistake. * * * ' " And again, "Even if the consideration for a deed is inadequate, the operative effect of the deed cannot be defeated in the absence of fraud, mistake, undue influence, or some other recognized equitable ground. Schneider v. Johnson, 357 Mo. 245, 207 S.W.2d 461, 467 [11]." The Radford case is very similar to this case. There we held that the promise of the grantee to support the grantor wholly or in part was sufficient consideration for a deed.

Appellant claims that after the grantor had executed the deed and had refused to sign the "Contract for Support in Consideration of Conveyance with Reverter Provisions" the grantees, through their attorney, were guilty of fraud in not "returning the deed" to the deceased. In such

---

5. Stubblefield v. Husband, 341 Mo. 38, 106 S.W.2d 419, 423; Dougherty v. Dougher-

ty, 204 Mo. 228, 102 S.W. 1099; Bross v. Rogers, Mo., 187 S.W. 38.

contention the appellant gives more weight to the written instrument than it deserves. Because first, the terms of said instrument were never agreed upon by the grantor and grantees; nor was it executed by the parties thereto. It was never a contract. That instrument was Attorney Wilson's idea. And next, the conveyance was made under the oral agreement between Walter and James. The idea of conveying originated with the grantor himself. At the time the deed was executed and delivered, James Smith had never seen the written "Contract for Support", had never discussed its contents with Attorney Wilson, and, in fact, had never met the attorney. James Smith testified quite positively that the Contract for Support was *not* the agreement which he and the grantor had made before the deed was executed. The fact that the attorney prepared an additional "Contract" did not change the oral agreement. It was by virtue of the earlier oral agreement, not Attorney Wilson's written "contract", that the property was conveyed to the grantees. Such oral contract was completed by the execution and delivery of the deed. Appellant would have us ignore Attorney Wilson's testimony that Walter Smith told him to record the deed for the reason that such statement was self-serving. For this to be true, Attorney Wilson would have had to testify to some statement which he, Wilson, had made out of court in his own interest. As was said in Bernhardt v. Boeuf & Berger Mutual Insurance Co., 319 S.W.2d 672, 674: "A self-serving declaration within the rule excluding same is one made by a party in his own interest at some place and time out of court, and does not include testimony which he gives as a witness at the trial". Wilson was testifying to a statement made by the grantor. No objection was made to the question or answer. Furthermore, Wilson was plaintiff's witness, and plaintiff should be bound by Wilson's uncontradicted testimony. Actually, there was an offer to reconvey the property after Walter refused to sign the written contract. But in any event, under the circumstances, we can not find fraud on the part of the grantees or

their attorney in not reconveying the property after the grantor refused to sign the written "contract". The execution of the written contract was not a condition precedent to the delivery and recordation of the deed. While there is no claim of mental incapacity as to Walter Smith, the welfare worker was careful to be sure in her mind that the grantor knew what he was doing and that he wanted to convey to the grantees. She talked with him alone earlier in the day and learned that Walter thought the plan a good one, and when asked at the trial if Walter knew what he was doing when he signed the deed, replied, "Definitely, yes". A client may be chargeable with a fraud perpetrated by his attorney within the scope of his employment, just as the client may be charged with the neglect of his attorney. 7 C.J.S. Attorney and Client § 67, pp. 850–851, and § 68, pp. 852–853; Commonwealth v. Smith, 242 Ky. 365, 46 S.W.2d 474, 478. But the evidence fails to prove fraud on the part of either the attorney or the grantees.

After a careful review of the record we are convinced that the plaintiff-appellant failed to meet the standard of evidence required. We have reached the inescapable conclusion that the finding and decree of the chancellor was for the right party, and our study of the transcript has caused us to independently reach the same conclusion. However, at the trial of this cause in September, 1966, two years nine months after grantor's death, plaintiff Gibson testified that he was renting the property for $140.00 per month and that plaintiff was making the payments on the note secured by a deed of trust. We affirm the judgment and decree that the respondents, James W. Smith and Annie Mae Smith, are the true and sole owners of the property and are entitled to the rents and profits therefrom, from the date of death of Walter L. Smith, December 24, 1963, less any payments for taxes and payments on the encumbrance made by plaintiff Gibson. It appears, therefore, that an accounting is necessary to equitably account for both the rents received and the payments made on the encumbrance since

December 24, 1963, by appellant, Earven Gibson.

Accordingly, the judgment is affirmed and the cause remanded for further proceedings not inconsistent with this opinion.

All of the Judges concur.