**Stephen DORSCH, Appellant–Respondent,**

v.

**FAMILY MEDICINE, INC., et al.; Larry Legler, Gregory Markway, Marvin Steiner, Respondent–Appellants.**

Nos. WD 63050, WD 63058.

Missouri Court of Appeals, Western District.

Jan. 25, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 1, 2005.

Application for Transfer Denied April 26, 2005.

David W. Whipple, Kansas City, MO, for appellant-respondent.

Mark A. Olthoff, Kansas City, MO, for respondent-appellants.

Before: LISA WHITE HARDWICK, P.J., ROBERT G. ULRICH and THOMAS H. NEWTON, JJ.

ROBERT G. ULRICH, Judge.

Stephen Dorsch, M.D., appeals the judgment of the trial court finding for Respondents Family Medicine, Inc. (FMI), a Missouri Corporation, and physicians and medical doctors, Larry Legler, Gregory Markway, and Marvin Steiner in his suit seeking a writ of mandamus and an accounting and asserting claims of breach of contract and fraud against his former employer and fellow stockholders. Dr. Dorsch also sought money damages for amounts that he claimed should have been paid him according to the Corporate Stock Agreement, wage-continuation payments according to the Employment Agreement between himself and FMI and Schedule A to the Employment Agreement, and incentive compensation according to the Employment Agreement and Schedule A.

The trial court determined that Dr. Dorsch failed to present supporting evidence for his claims for a writ of mandamus, accounting and fraud (counts I, II, and IV). The trial court also determined that Dr. Dorsch was not entitled to recovery for breach of contract under either the Employment Agreement or Appendix A of the agreement. The court entered judgment for the Respondents and against Dr.

Dorsch on all counts. Despite Dr. Dorsch's request for a jury trial, the trial court heard both equitable and legal claims as the trier of fact, applying the equitable clean-up doctrine.

Both Dr. Dorsch and Respondents appeal. Dr. Dorsch appeals the trial court's judgment. Respondents cross-appeal the trial court's order sanctioning their failure to provide discovery as directed and the court's award to Dr. Dorsch for additional expenses incurred because of Respondent's failure to disclose financial documents.

The judgment of the trial court is affirmed. The trial court's order of sanctions is reversed.

## Facts

Dr. Stephen Dorsch was hired by FMI [1] in October of 1986. Dr. Dorsch's initial Employment Agreement outlined that he would be paid a base salary plus "incentive compensation" [2] based upon his individual adjusted gross billings. The practice of FMI was to allow individual physicians to become shareholders in the corporation after a period of time—usually after one year. By becoming a shareholder, physicians in the corporation were entitled to significant benefits, including improved income potential and patient access.

At the time that Dr. Dorsch was hired, the corporation's 1000 shares of stock were entirely owned by Dr. Larry Legler. On January 31, 1987, Dr. Legler sold 500 of these shares to Dr. Greg Markaway at a price of $1 per share. Until discovery was conducted in this action, the price paid by Dr. Markaway for his shares of FMI stock was never revealed to Dr. Dorsch.

In December of 1986, Dr. Dorsch began discussing the prospect of becoming a shareholder in FMI with Doctors Legler and Markaway. In May 1987, at the end of FMI's fiscal year, Dr. Dorsch became aware that a shareholder agreement was forthcoming. The arrangement was solidified on September 1, 1987, at which time four separate documents were signed. Dr. Dorsch read and executed a Corporate Stock Sale Agreement, a [Stock] Subscription Agreement, an Employment Agreement, and "Schedule A," an addendum to the Employment Agreement. He was sold 333 1/3 shares of FMI at a price of $87.21 per share, at a total purchase price of $27,240.00. FMI's accountant, Paul Dooley, determined the price for the stock. Dr. Dorsch was made both a shareholder in the company and a member of its board of directors.

"Schedule A" of the Employment Agreement outlined two forms of compensation. The Agreement provided for both a base salary and the potential for incentive compensation based upon the performance of an individual doctor's "department." Incentive compensation was only awarded if a doctor's department remained profitable after the deduction of shared expenses. Incentive compensation was to be computed by FMI's board of directors, at least once, following the close of a fiscal year.

In January of 1992, Dr. Marvin Steiner was hired by FMI. On February 1, 1993, he became a shareholder in the corporation. Dr. Steiner purchased 250 total shares of FMI for a price of $130.90 per share, with a purchase price totaling $32,724.00. The shares were purchased in

---

1. Except where the actions of an individual named respondent/defendant are important to the decision, the acronym FMI will be used to denote both the corporation and the respondents collectively.

2. Trial testimony indicates that the term "incentive compensation," used throughout FMI's employment agreements with Dr. Dorsch, is synonymous with the term "bonus."

equal amounts from Doctors Legler, Markway, and Dorsch, resulting in each of the four doctors owning 25% of the total company stock.

The relationship between Dr. Dorsch and Respondents began to deteriorate in the late 1990's. For reasons unrelated to this appeal, Dr. Dorsch was notified of his termination at a Board of Director's meeting on August 26, 1999. Dr. Dorsch was officially terminated by FMI effective October 25, 1999. The Corporate Stock Sale Agreement signed by Dr. Dorsch provided specific terms for the repurchase of stock by the company in the event of termination. On January 10, 2000, FMI attempted to purchase Dr. Dorsch's remaining 250 shares for a price of $1,422.53, at a value of approximately $5.69 per share.

Dr. Dorsch brought this suit against FMI on June 13, 2000. His petition sought four separate claims for relief: (1) a writ of mandamus ordering FMI to allow Dr. Dorsch access to the company's books; (2) an accounting of the book value of FMI stock, as well as income and expenses attributable to Dr. Dorsch; (3) a claim for breach of contract; and (4) a claim for fraud. The parties appeared for trial on April 22, 2002, and the case was tried to the court. The trial court dismissed three counts of the petition at the close of the plaintiff's evidence. Only the breach of contract claim survived the motion, and the trial court heard evidence from the defendants on that issue alone. On April 29, 2003, the trial court entered its judgment in favor of FMI and the named defendants as to all four counts. The court also ordered sanctions against the defendants for failure to make complete discovery. This appeal and cross-appeal followed.

## I. Equitable Clean Up

■ Dr. Dorsch's first three points on appeal address the propriety of the trial court's decision to apply the "equitable clean up doctrine" to resolve his claims. At the onset of trial, counsel for Dr. Dorsch requested a jury trial on all issues before the court. The court observed that each count of the action (including the fraud and contract claims) called for some form of equitable relief and that the underlying claims for damages were incidental to the equitable relief sought. Counsel for Dr. Dorsch then requested a jury trial as to the legal issues, and requested that the court limit its own factual findings to the claims for equitable relief. The court proceeded to try the entire case itself, while allowing the potential for impaneling a jury if during the trial there appeared to be "a sufficient separation between the issues of liability and damages to justify the seating of a jury in connection with the damage claims."

■ Under then existing case law, the rationale applied by the trial court was carefully and appropriately applied. However, while this appeal was pending, the Missouri Supreme Court issued a ruling that clarified Missouri's position on the "equitable clean up doctrine." In *State ex rel. Leonardi v. Sherry*, the Missouri Supreme Court recently ruled that

Missouri trial courts have jurisdiction to try cases involving requests for equitable relief and damages in one proceeding. The trial court has discretion to try such cases in the most practical and efficient manner possible, consistent with Missouri's historical preference for a litigant's ability to have a jury trial of claims at law. Unless circumstances clearly demand otherwise, trials should be conducted to allow claims at law to be tried to a jury, with the court reserving for its own determination only equitable claims and defenses, which it should de-

cide consistently with the factual findings made by the jury.

137 S.W.3d 462, 473 (Mo. banc 2004). Based upon this ruling, the court should have impaneled a jury to hear Dr. Dorsch's legal claims. "Trying incidental claims at law to the court ... should be the exception and not the rule." *Id.* at 474. Neither party disputes the appropriateness of the trial court's resolution of the claims for equitable relief.

While this ruling certainly informs the issues presented, it does not completely decide them, and the clarification of law does not entirely resolve the questions posed by this appeal. Even though a trial by jury would have been proper, the question remains whether denial of a jury trial regarding the legal issues is reversible. Before trial court error is reversible, the appellant must demonstrate that the error materially affects the outcome of the action. RSMo 512.160.2 (2000); Rule 84.13(b). While the trial court may have been erroneous in its conclusion that no jury was required, the underlying fraud and breach of contract claims were decided—in one fashion or another—as matters of law. If these decisions were in fact correct, the ultimate decisions would still have rested with the trial court, and not with the jury.[3] Consequently, determining whether Dr. Dorsch was prejudiced by the court's decision requires examination of appellant's points four and five. FMI also raised the alternative question of whether the right to a jury trial was waived.

## II. Fraud Claim

In his fourth point on appeal, Dr. Dorsch contends the trial court erroneously granted FMI's motion for judgment as a matter of law for lack of evidence regarding his fraud claim. Had the trial court impaneled a jury, FMI's motion would have been brought as a motion for directed verdict at the close of plaintiff's evidence. Because review is of both the trial court's decision and the question of prejudice, analysis must address whether the case submitted by Dr. Dorsch as plaintiff would have survived the post-evidence motion.

▪ "When ruling on a defendant's motion for a directed verdict at the close of the plaintiff's evidence, the trial court must view the evidence in the light most favorable to the plaintiffs, and they should receive the benefit of all reasonable inferences." *In re Estate of Mapes,* 738 S.W.2d 853, 855 (Mo. banc 1987). However, if the plaintiff fails to support one or more of the elements of a cause of action by substantial evidence, a directed verdict is proper. *Bond v. Cal. Comp. & Fire Co.,* 963 S.W.2d 692, 696 (Mo.App. W.D.1998).

▪ The circumstances constituting fraud must be pled with particularity, with an exception for the general pleadings of mental conditions such as intent or knowledge. Rule 55.15. To survive a motion for directed verdict, a fraud claim must show substantial evidence of (1) a representation, (2) its falsity, (3) its materiality, (4) that the speaker knew of the falsity or was ignorant of its truth, (5) that the speaker intended the representation be acted on in the manner reasonably contemplated, (6) the hearer's ignorance of falsity,

---

**3.** A concern continues even after the *Leonardi* opinion—the practicality of efficiently managing a trial. When both legal and equitable issues are presented to a trial court, the court must still decide the practical considerations of which claims to try first, and the Missouri Supreme Court has sought to preserve the trial court's flexibility in this regard. *See State ex rel. Leonardi,* 137 S.W.3d at 474. This opinion affords deference to the trial court's decision that a jury would be impaneled only if the evidence presented so required.

(7) the hearer's reliance on the representation as being true, (8) the hearer's right to rely on the truth of the representation, and (9) the hearer was consequently and proximately damaged. *See Sofka v. Thal,* 662 S.W.2d 502, 506 (Mo. banc 1983). The essential elements of a fraud claim must be strictly proven *as pleaded. Wion v. Carl I. Brown & Co.,* 808 S.W.2d 950, 953 (Mo. App. W.D.1991).

■ The initial pleadings allege that Dr. Dorsch purchased FMI stock in reliance on the fraudulent representation that stock redemption was meant as a means of compensating Dr. Dorsch for increasing the value and good will of FMI.[4] The trial court based its judgment as a matter of law on the decision that Dr. Dorsch was not induced to enter the contracts by any misrepresentation or omission of FMI.

The trial court's decision was based upon four findings. First, that FMI did not knowingly make any false representations to Dr. Dorsch. Second, FMI made no representations to Dr. Dorsch that its stockholders knew or should have known was incorrect. Third, the court found that Dr. Dorsch presented no evidence of any intent to defraud. Finally, the court found that Dr. Dorsch did not rely to his detriment on any misrepresentation or omission because he presented no evidence that any misrepresentations or omissions were made by any defendant.

Dr. Dorsch asserts that the trial court merely made one finding, that false representations were not made. The record shows, however, that the trial court found two distinct elements of the fraud claim

lacking: first, the absence of evidence that any of the representations made by FMI were false, and; second, no evidence was submitted to indicate awareness of the falsity of the representations. Dr. Dorsch contends on appeal that the court's ruling was erroneous because evidence was submitted of two separate false representations.

The first of these alleged misrepresentations was that the actual value of the FMI stock was reflected in the price that he paid $87.21 per share for a total purchase price of $27, 240.00. No methodology for assessing the price of stock was included within the subscription agreement. Dr. Dorsch testified at trial, however, that at the time he signed the Subscription Agreement, he was given the information that the stock purchase price was based on production and receipts of the corporation multiplied by a percentage factor and then divided by the total number of shares. Dr. Dorsch also argues that the falsity of this representation was compounded by the failure of respondents Legler and Markaway to reveal that Dr. Markaway had paid only $1 per share in a purchase earlier in the same year.

The second alleged misrepresentation was that the formula for calculating the value of stock being purchased would be the same formula used to calculate the value of the stock at redemption. While no method of valuation is provided in the Subscription Agreement, the Corporate Stock Sale Agreement specifically provided that upon termination, stock redemption shall be based upon the book value of

---

4. The petition reads as follows:

 41. That when Defendants Legler and Markway represented to Plaintiff that his purchase of stock of Defendant Corporation was a means of compensating Plaintiff for the value, good will and build up of Defendant Corporation, said Defendants knew such representations to be untrue and false, knowing full well that the Corporate Stock Sale Agreement would not compensate Plaintiff for his hard work, good will and build up of business of Defendant Corporation in the event his employment terminated with Defendant Corporation.

the stock as determined by generally accepted accounting principles.[5] Dr. Dorsch testified that he did not understand the meaning of the language within the Agreement and was notified by Dr. Legler and Paul Dooley that the methods of calculation were substantially similar for purchase price and the price upon redemption. Dr. Dorsch paid $87.21 per share at his initial purchase of FMI stock, and sold 83 1/3 of these shares to Dr. Steiner for $130.90 per share. However, upon redemption to the company, Dr. Dorsch was offered only $5.69 per share.

The determination before this court is whether these representations constitute sufficient evidence to satisfy the elements of a submissible case of fraud as outlined within the pleadings. The plaintiff who alleges "certain and definite misrepresentations" bears the burden to substantially prove the misrepresentations that have been alleged. *Wion*, 808 S.W.2d at 954. "Fraud imputes venality and corruption to the person charged with it, and both reason and law require clear and convincing proof of it." *Centerre Bank of Independence v. Bliss*, 765 S.W.2d 276, 284 (Mo.App. W.D.1989) (quoting *Gibson v. Smith*, 422 S.W.2d 321, 328 (Mo.1968)).

No evidence was presented that the first of these representations was fraudulent. While the scope of this appeal does not include evaluating the "actual value" of a stock, Dr. Dorsch was accurately appraised of the manner in which the stock price was calculated. Dr. Legler's decision to antecedently sell his own stock at a different price to Dr. Markaway is irrelevant to this action. Dr. Dorsch decided to purchase the stock after being correctly informed of the manner in which his own stock price was determined. He determined whether the privileges of ownership were properly valued by these calculations. None of the respondents made a false representation to Dr. Dorsch regarding the value of FMI stock when he purchased it.

The second representation, that the same methodology used to calculate stock value when Dr. Dorsch purchased stock would be employed to determine its value upon redemption, manifests similar deficiencies. The evidence offered to support the claim is Dr. Dorsch's testimony that Dr. Legler and Paul Dooley indicated that the "general accounting principles" referenced in the Corporate Stock Sale Agreement were "similar to the calculations for the purchasing of the stock." Dr. Dorsch later testified "[t]he Subscription Agreement again has no calculation at all as to how the stock value is come up with and I was given, you know, the verbiage that we use production and there is a percentage of this and then it's divided out."

Nothing within this testimony indicates that the representations of either Dr. Legler or Mr. Dooley were false. At

---

5. Paragraph 4 of the Corporate Stock Sale Agreement reads

"Should any of the events specified in paragraph 3 of this agreement [which includes termination] occur, the Corporation shall redeem and acquire all the common stock of the Corporation owned and held by Shareholder at the book value of said common stock as shown on the books and records of the Corporation's taxable fiscal year which immediately precedes the occurrence of said event." [Brackets added]

The same paragraph later indicates that, subject to further qualifications based upon taxes, profit sharing, and pension payments, "book value of the common stock of the Corporation as of the last day of the Corporation's taxable fiscal year immediately preceding the occurrence of the event shall be determined according to generally accepted accounting principles."

no time did the parties indicate that upon redemption the same formula would be utilized or that the redemption price would be similar. Furthermore, no testimony was offered to indicate that these two parties knew this representation was false at the time it was made. The truth or falsity of a representation is determined at the time the representation was made and at the time the representation is intended to be acted on. *Blanke v. Hendrickson,* 944 S.W.2d 943, 944 (Mo.App. E.D.1997). The argument raised on appeal is that these representations "proved to be false" nearly twelve years after the fact, which fails to satisfy the requirements of proof for a submissible claim of fraud.

Neither of these representations, viewed individually or in the aggregate, provide sufficient evidence that fraud has occurred. Insufficient evidence existed to support Dr. Dorsch's claim of fraud and the trial court did not err in granting the defendants' motion for a directed verdict on the issue at the close of the plaintiff's evidence. Furthermore, the rationale utilized by the trial court to grant the judgment as a matter of law would have been proper had a jury been impaneled and had been used to grant a directed verdict.

FMI further argues that the fraud claim is barred by the statute of limitations. The theory adopted is that Dr. Dorsch, as a director and shareholder of FMI, should have become aware of any potential fraud at the time that stock was sold to Dr. Steiner in 1993. Because the fraud claim was properly decided as a matter of law, this claim is moot and need not be determined.

## III. Breach of Contract Claim

Dr. Dorsch's fifth point on appeal is that the trial court improperly found that FMI had not breached its employment contract with Dr. Dorsch, despite FMI's failure to pay incentive compensation following his termination.[6] Unlike the fraud claim, the trial court overruled the defendants' motion for judgment as a matter of law at the close of plaintiff's evidence regarding the breach of contract claim. FMI was allowed to present evidence on the remaining claim, and the case was submitted to the trial court. Counsel for FMI brought a joint motion for judgment as a matter of law at the close of all the evidence, which the trial court took under advisement with the case.

Dr. Dorsch suggests that allowing the case to be submitted inherently prejudiced the breach of contract claim at law and not in equity, because the trial court decided the case while sitting as a trier of fact instead of a jury. Although the trial court made findings of fact, the breach of contract claim was decided as a matter of law. The suggestion that Dr. Dorsch was inherently prejudiced fails to consider the nature of a breach of contract claim. Missouri law holds that the interpretation of a contract is a question of law, and is reviewed de novo on appeal. *Goldstein & Price, L.C. v. Tonkin & Mondl, L.C.,* 974 S.W.2d 543, 551 (Mo.App. E.D. 1998). Review must still address the question of whether Dr. Dorsch was prejudiced by the failure to impanel a jury.

Answering this second question requires examination of the extent to

---

**6.** Dr. Dorsch actually brought two separate breach of contract claims, one requesting equitable relief (an accounting) arising out of a claimed breach of the Corporate Stock Sale Agreement, and another praying for damages for a breach of the incentive compensation portion of the employment contract. Point five addresses only the legal claim, which is also the only claim implicated by the improper application of the equitable clean up doctrine.

which the contract question was a so-called "pure" question of law. If the trial court was not required to reference extrinsic evidence, examine credibility, or draw inferences from evidence to reach its conclusions, then it was not acting as a trier of fact when it rendered its judgment. If the case was resolved as a "pure" question of law, it cannot be said that Dr. Dorsch was prejudiced by the lack of a jury. Pure questions of law would be resolved by a directed verdict at the close of all the evidence, and no issues would have been submitted to the jury. However, if the trial court's determination was based upon the weighing of evidence to any question of fact, *Leonardi* dictates that a jury should have decided those questions. 137 S.W.3d at 473.

■■■■ Consequently, this case is reviewed as if it was decided as a question of law and thus treated as if it had been resolved by a directed verdict in favor of FMI. The evidence is reviewed in the light most favorable to the party against whom the directed verdict was granted. *Morris v. J.C. Penney Life Ins. Co.,* 895 S.W.2d 73, 76 (Mo.App. W.D.1995). The issue for resolution is whether the plaintiff has presented a submissible case. *Mathis v. Jones Store Co.,* 952 S.W.2d 360, 365 (Mo. App. W.D.1997). Examining the submissibility of a case is a question of law, reviewed by presuming the plaintiff evidence to be true, and giving plaintiff "the benefit of all reasonable and favorable inferences drawn from the evidence." *See Killion v. Bank Midwest, N.A.,* 987 S.W.2d 801, 808 (Mo.App. W.D.1998)(quoting *Riley v. Riley,* 847 S.W.2d 86, 88 (Mo.App.1992)).

Dr. Dorsch argues that the trial court improperly found the absence of a breach of the employment contract with FMI despite FMI's refusal to pay incentive compensation following his termination. Dr.

Dorsch was notified of his termination in August of 1999, but continued seeing patients with FMI until September 15. His official termination date was October 25, 1999, and he continued to receive his base salary until that date. However, Dr. Dorsch received no incentive compensation after May 31, 1999.

Paragraph 2 of "Schedule A" to the Employment agreement is a general provision regarding the payment of incentive compensation, and reads:

In addition to base salary, the Employee shall receive incentive compensation, if any, computed by the Board of Directors pursuant to this paragraph. Incentive compensation shall be computed and paid pursuant to the computations at least once during each fiscal year of the Corporation, the time and manner of payment of such incentive compensation to be determined by the Corporation's Board of Directors. All incentive compensation shall be paid less deductions for withholding taxes and other deductions required by law. *It is specifically recognized that the purpose of this incentive compensation shall be to make the total compensation paid equal to the reasonable value of his services to the extent that the Corporation is financially able to pay such compensation without incurring loss.* [emphasis added]

The argument presented by Dr. Dorsch is that he was entitled to receive a percentage of the incoming profits of FMI from June 1, 1999, through September 15, 1999, based upon the reasonable value of his services while he continued to work for the corporation. Dr. Dorsch presented testimony by a CPA, Mark Vianello, that under accepted accounting principles, compensation for the rendering of services should be assessed at the time that a patient is given

care.[7]

 However, "Schedule A" also contains a specific provision regarding incentive compensation when a physician has been terminated by FMI. Paragraph 8 reads:

In the event of termination of Employee's employment, regardless of the reason, the Corporation's Board of Directors shall as of the last day of the calendar month following the month in which Employee's employment terminates, determine whether Employee is entitled to receive any additional compensation because of Employee's efforts through his last day of employment. *The Board of Directors shall make such determination by utilizing principles similar to those which it would have applied in the making of a determination of incentive compensation for Employee under paragraph 2 hereof.* In the event the Board of Directors determines that additional compensation is due Employee then such additional compensation shall be paid, less deductions for withholding taxes and other deductions required by law, within thirty (30) days following the date as of which such determination was made. [Emphasis added]

The interpretation of a contract is entirely a question of law, the cardinal rule of which is to ascertain the intention of the parties and give it effect. *Sonoma Mgmt. Co. v. Boessen,* 70 S.W.3d 475, 479 (Mo. App. W.D.2002). This intention is solely determined by the contract itself unless an ambiguity is found within the contract. *Id.* "A contract is ambiguous only if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain." *Id.* (quoting *Atlas Reserve Temps. v. Vanliner Ins. Co.,* 51 S.W.3d 83, 87 (Mo.App. W.D.2001)). Whether a contract is ambiguous is also a question of law. *Yerington v. La–Z–Boy, Inc.,* 124 S.W.3d 517, 520 (Mo.App. S.D. 2004).

Dr. Dorsch has offered no grounds for finding these provisions ambiguous, and there is nothing within the record to indicate they should be treated as such. Instead, the ground offered both at trial and on appeal for enforcement of the contract is that Paragraph 2 provides for payment based upon the reasonable value of services provided. The trial court ruled upon these provisions as if Paragraphs 2 and 8 were in conflict, and applied the rule of construction that a specific clause acts to modify or *pro tanto* nullify a more general clause. *See e.g. A & L Holding Co. v. S. Pac. Bank,* 34 S.W.3d 415, 419 (Mo.App. W.D.2000).

These provisions do not conflict with each other, however. While Paragraph 2 provides a general analysis of the manner in which incentive compensation is to be paid, Paragraph 8 provides a qualification of the payments in the event of termination. Paragraph 8 incorporates those provisions of Paragraph 2 prescribing principles for determining whether an employee is entitled to incentive compensation but modifies the scope with which the analysis of incentive compensation is made. Rather than basing its determination on a consideration of the entire fiscal year, the time frames outlined in Paragraph 8 require incentive compensation to be determined by a much more limited review.

---

**7.** While this testimony is present in the record, it was only allowed for a limited purpose. An objection was raised that the testimony was either parol evidence or a legal conclusion based upon Mr. Vianello's interpretation of the contract. The trial court responded by stating "The Court takes into account the fact that this is for accounting purposes, and of course it is reserved for the Court to determine what the contract means."

These two provisions are harmonious, and there is no conflict between them. Because Dr. Dorsch's termination as an employee of FMI is not disputed, the applicable contractual provision is Paragraph 8 of "Schedule A."

The clear language of Paragraph 8 does not state, as Dr. Dorsch argues, that an employee is entitled to incentive compensation through the last day of his employment. Rather, the contract specifically states that the Board of Directors must determine whether the employee is entitled to such compensation as of the last day of the month of termination, and the Board must utilize principles similar to those used in determining incentive compensation under Paragraph 2. This incentive compensation, if any is found due, must be paid to the terminated employee within 30 days of the determination. The intent of this provision is to provide a means of evaluating the payment of incentive compensation when the corporation terminates an employee. It provides a means of expediting the procedures and ensures that the corporation will use the same methodology it would use if the employee remained with FMI.

■ While the application of these terms to Dr. Dorsch may seem harsh, certainly situations could occur in which this provision would be exceptionally beneficial. The basis of Dr. Dorsch's claim is that FMI should have used a method of accounting that compensated him at the time that his services were rendered on behalf of the corporation. Nonetheless, the law presumes that Dr. Dorsch had knowledge of the contents of this contract when he signed it. *See Binkley v. Palmer*, 10 S.W.3d 166, 171 (Mo.App. E.D.1999). Absent a showing of fraudulent induce-

ment, Dr. Dorsch is further presumed to have agreed to this form of expedited analysis.

Even if all of Dr. Dorsch's evidence is presumed true, and all reasonable inferences are resolved in his favor, he has failed to prove FMI had breached the contract. FMI's practice prior to Dr. Dorsch's termination was to evaluate the performance of each doctor's department at the end of the fiscal year. If the department showed a negative balance, then no incentive compensation was paid. Due to the precarious nature of incoming receipts, which frequently differed from those billed, the decision of whether a department was profitable at the end of a fiscal year was made without considering accounts receivable. Dr. Dorsch's employment was terminated effective October 25, 1999, and evaluation for incentive compensation by the Board was done after October. At the end of October 1999, Dr. Dorsch's department showed a negative balance. None of this evidence is in dispute.

■ Dr. Dorsch had been paid incentive compensation under the terms of "Schedule A" throughout his employment by FMI. The basis of the breach of contract claim is that because Dr. Dorsch continued to see patients through September, his unpaid accounts receivable should have been used to offset the negative balance.[8] However, the nature of this claim is not that FMI's Board of Directors failed to follow the same practice it had previously utilized to compute incentive compensation. Instead, the claim advanced is that continuing to use the same method following Dr. Dorsch's termination unfairly compensated him for services provided to the

---

8. According to the testimony of Sandra McCormack, FMI's practice manager, FMI collected more than $111,000 between Sep-

tember 1, 1999, and March 2002 from patients treated by Dr. Dorsch while he was employed by FMI.

corporation. In effect, Dr. Dorsch's claim is that FMI breached its contract with him by expressly following it. By accepting the benefits of a contract, a party cannot escape those provisions of the agreement that prove non-beneficial to him. *See Chagnon v. Shampaine Indus.*, 412 S.W.2d 519, 528 (Mo.App.1967). Furthermore, this issue is decidable as a matter of law and requires no weighing of the factual evidence presented to reach this outcome.

The trial court reached the correct ruling regarding Dr. Dorsch's breach of contract claim. The ruling was decided as a matter of law, not as a question of fact, as Dr. Dorsch failed to make a submissible case of breach of contract. Consequently, it cannot be said that Dr. Dorsch has been prejudiced by the failure of the trial court to impanel a jury even though the claim as pled was a legal issue because he failed to make a submissable case.

## IV. Prejudice

 Despite the trial court's use of the equitable clean-up doctrine, Dr. Dorsch was not prejudiced by the failure of the trial court to impanel a jury. Because both the fraud and breach of contract claims were properly decided as matters of law, had a jury been impaneled it would not have been permitted to decide the case. The failure to impanel a jury would have had no material effect on the outcome of the action. Consequently, Dr. Dorsch's claimed points of error are denied.[9]

## V. Cross–Appeal

 In the single point of error raised on cross appeal, FMI alleges that the trial court improperly awarded sanctions for failing to comply with discovery. Dr. Dorsch filed a motion for sanctions on April 19, 2002, alleging that FMI's failure to produce documents requested in the Plaintiff's First Request for Production of Documents. In its order dated April 29, 2003, the trial court directed FMI to pay $10,000 for additional costs and expenses because FMI failed to provide complete discovery. The cross-appeal contends that FMI's actions stated in the motion were non-sanctionable in that they violated no court order and were not contumacious behavior.

 The decision of a trial court to impose sanctions is reviewed under an abuse of discretion standard. *Long v. Cross Reporting Serv.*, 103 S.W.3d 249, 254 (Mo.App. W.D.2003). "An abuse of discretion occurs when the court's order is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* (quoting *Brown v. Kirkham*, 23 S.W.3d 880, 882–83 (Mo.App. W.D.2000)). The reviewing court should not decide whether it would have imposed the same sanctions, but whether the trial court could have reasonably concluded the sanctions were proper under the circumstances. *Eidson ex rel. Webster v. Eidson*, 7 S.W.3d 495, 499 (Mo. App. W.D.1999).

FMI was served with Dr. Dorsch's original request for production of documents on October 16, 2000. A timely response was provided to Dr. Dorsch on November 20, 2000, which included objections to production of some of the requested documents.

---

9. Respondents have also argued that Dr. Dorschs right to a jury trial was waived. As previously discussed, trial counsel for Dr. Dorsch requested before trial that a jury hear all legal claims. Additionally, counsel raised the failure to impanel a jury again in his motion for a new trial. Having concluded that the failure to impanel in this case is not a reversible error, whether these actions were sufficient to preserve the issue for appeal need not be determined.

Two of the requests objected to were for patient information, which FMI objected to on the basis that the request included documents to which the physician/client privilege applied. In a letter to FMI's counsel dated December 26, 2001, Dr. Dorsch requested additional documents that had been testified to in the deposition of Dr. Legler. Included in this letter were further requests for patient information and a zip code analysis conducted by FMI. Counsel for FMI responded in a letter dated February 21, 2002, and objected to the disclosure of the zip code analysis as work product. An identical objection was raised to other document requests.[10] Dr. Dorsch had also requested further access to financial information. The financial information was objected to as irrelevant to the underlying breach of contract action.

Dr. Dorsch filed a "Golden Rule" letter on February 28, 2002.[11] The letter emphasized that the patient information had not been objected to and not disclosed. Counsel for FMI responded on March 7, 2002. Responsive documents were provided, except for requests for financial information, which FMI characterized as "overbroad" and "irrelevant."[12] The zip code analysis was still objected to as "work product." Counsel for Dr. Dorsch sent another letter on March 13, 2002, once again requesting

the documents and notifying FMI that he intended to file a motion to compel.

Dr. Dorsch filed a motion to compel discovery on March 14, 2002. The Court held a conference on the motion on April 2, 2002, at which time the zip code analysis was released to Dr. Dorsch. No court order compelling the discovery was entered, and the record is void of the substance of this conference. Dr. Dorsch filed a motion for sanctions on April 19, 2002. The trial court's order of sanctions was dated April 29, 2003.

The essence of the point on appeal is FMI's cross-appellant claim that the rule explicitly requires objections be overruled before a litigant can be sanctioned for failure to provide requested documents. Alternatively, the cross appeal contends that a litigant's actions must be contumacious before sanctions can be imposed.

Missouri Supreme Court Rule 61.01(d) grants trial courts discretion to impose sanctions against a party or the party's attorney for failure to produce discoverable documents, which may include attorney's fees incurred that are attributable to the failure to disclose. In relevant part, Rule 61.01(d) states,

> If a party ... fails to produce documents and tangible things as requested under Rule 58.01, or timely files objec-

10. The documents requested in the letter were (1) information regarding the number of patients that had moved with Dr. Dorsch following his termination; (2) information regarding the approximate number of patients who visited FMI in October of 1999; (3) copies of requisitions received by FMI to transfer patients to Dr. Dorsch; and (4) the zip code analysis. All of these were objected to generally as a product of the zip code analysis, which defense counsel claimed was work product.

11. Local Rule 33.5(4) of the Sixteenth Judicial Circuit requires that motions made pursuant to Supreme Court Rules 56–61 include an affidavit of the movant "[t]hat he has commu-

nicated in writing with the opposing party or his counsel in a sincere attempt to resolve the differences relating to such motion."

12. The primary objection to the financial information was that it was irrelevant to the lawsuit. The requested documents pertained to the accounts receivable attributable to patients who visited FMI prior to Dr. Dorsch's termination. FMI's position was that the documents requested were in no way relevant to the breach of contract action, and therefore not reasonably calculated to lead to the discovery of admissible evidence in violation of Rule 56.01(b)(1).

tions thereto that are thereafter over-ruled and the documents and things are not timely produced ... the court may, upon motion and reasonable notice to other parties, make such orders in regard to the failure as are just. . . .

 The intent of Rule 61.01(d) is evident. If a party fails or refuses to provide information requested and has not objected to the production of the items, the trial court may impose sanctions. If the party from whom items are sought in accordance with the rule files objections to the production of requested items, the court must rule on the objections. Should the court overrule or deny the objections, the objecting party is compelled to produce the requested items for discovery. Should the party opposing the discovery continue to decline to produce the requested items, the party seeking the discovery may formally seek the court's order imposing sanctions against the noncompliant party. A trial court is granted broad discretion in controlling discovery, and this discretion extends to the choice of remedies in response to the non-disclosure of evidence. *Wilkerson v. Prelutsky*, 943 S.W.2d 643, 647–48 (Mo. banc 1997). This discretion is tempered in that sanctions should be limited to what is required to accomplish the purposes of discovery. *See Fairbanks v. Weitzman*, 13 S.W.3d 313, 327 (Mo.App. E.D.2000). Before sanctions may be imposed on a party for failing to engage in discovery, the trial court must determine that the party seeking sanctions has been prejudiced by the errant party's non-compliance. *Eidson*, 7 S.W.3d at 499.

The record is void of essential information to permit proper review. Transcripts of the hearings regarding discovery disputes, if any hearings occurred, are not present in the record. Indeed, FMI claims that no formal hearing occurred that addressed their objections to the pro-duction of documents. No rulings are provided regarding the legitimate questions of law presented in the Respondent's objections to discovery. The record does not contain any order compelling discovery. While the parties make comment in their briefs about behavior that may have been appropriately sanctioned, none of this is properly presented in the record on appeal. The record does not demonstrate support for the position that FMI failed to properly engage in the discovery process. Insufficient evidence exists from which to find that the trial court properly exercised its discretion in awarding sanctions. The point is granted.

The judgment of the trial court is affirmed as to both the fraud and breach of contract claims. The trial court's order of sanctions is reversed.

LISA WHITE HARDWICK, P.J. and THOMAS H. NEWTON, J. concur.